UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:16-cv-10519-RGS

SOUTH BOSTON ALLIED WAR VETERANS
COUNCIL,
Plaintiffs,
v.
THE CITY OF BOSTON,
Defendant.

## DEFENDANT CITY OF BOSTON'S OPPOSITION TO PLAINTIFF, SOUTH BOSTON ALLIED WAR VETERANS COUNCIL'S MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

Defendant, City of Boston ("City"), respectfully requests that this Court deny Plaintiff,

South Boston Allied War Veterans Council's ("Allied") Motion for a Temporary Restraining

Order and Injunctive Relief on the grounds that it has failed to prove the prongs necessary for

this Court to grant injunctive relief.  Specifically, Allied has failed to prove that it is likely to

succeed on the merits of its claim that the City's shortening of its requested parade route violates

its First Amendment rights, that it will be irreparably harmed by the City's decision, or that the

balance of the harms weighs in its favor.  As a result, Allied's request for temporary injunctive

relief should be denied.

## FACTS

Since 2011, the Boys and Girls Club Road Race (hereinafter "Road Race"), the South

Boston Allied War Veterans Council St. Patrick's Day Parade (hereinafter "AWV Parade"), and

the St. Patrick's Day Peace Parade sponsored by the Veterans for Peace ("VFP") (hereinafter

"VFP Parade") have been held on the Sunday closest to March 17 in the neighborhood of South

Boston.  See Affidavit of Superintendent Bernard O'Rourke (hereinafter "O'Rourke ¶ __"),

attached hereto as <u>Exhibit A</u>, ¶ 4.  Since 2011, the schedule for the three events has remained

unchanged; the Road Race begins at 11:00 a.m., followed by the AWV Parade at 1:00 p.m.,

followed by the VFP Parade, which begins when the last unit of the AWV Parade has reached a

distance of one mile from the start of the VFP Parade route.[1]  *Id.* ¶ 5.

      In order to ensure the public safety, the City of Boston Police Department (hereinafter the

"Department") is required to staff law enforcement officers from all districts, commands, and

special units of the Department.  *Id.* ¶ 6.  Since 2011, both parades have followed the same route

through South Boston, although the VFP parade is slightly shorter.  *Id.* ¶ 7.  The AWV Parade

begins on West Broadway near the Broadway MBTA Station, while the VFP Parade begins at

the intersection of D Street and West Broadway, approximately three blocks from the start of the

AWV Parade route.  *Id.*  The route continues along West Broadway to East Broadway then turns

right onto P Street, then turns right onto West Fourth Street.  *Id.*  The route loops back towards

the finishing point at Andrew Square in South Boston.  *Id.*

      The Road Race shares a large portion of the parade route.  O'Rourke ¶ 9.  The Road Race

course begins and ends at the Boys and Girls Club at the intersection of F Street and West 6th

Street, before taking a left on Dorchester Street, then a right on East Broadway.  *Id.*  The race

route then travels to the intersection of Farragut Road at the end of East Broadway, before

turning around and traveling back down East Broadway, to West Broadway.  *Id.*  The race then

takes a left onto E Street (one block from the start of the VFP Parade route), then a left onto

West 6th Street before terminating at the Boys and Girls Club.  *Id.*  Because these events occur on

the same day in the same neighborhood, and occupy a largely similar route, the Department has

developed an operational plan in an attempt to address the public safety concerns associated with

an influx of upwards of 750,000 participants and spectators into a densely populated urban area. *Id.* ¶ 10.

Providing a secure atmosphere in South Boston for participants and spectators, including safe ingress and egress from the neighborhood, is the primary public safety concern associated with the St. Patrick's Day events.  O'Rourke ¶ 12; Affidavit of Police Commissioner William B. Evans (hereinafter "Evans ¶ __"), attached hereto as <u>Exhibit B</u>, ¶ 11.  To that end, the Department restricts access to the Road Race course and the parade routes throughout the day. *Id.* ¶ 13.  The Road Race begins at 11:00 a.m. the last participants typically finish at noon.  *Id.*

Department personnel follow the Road Race and close intersections in front of the runners and walkers on a rolling basis so that participants may complete the Road Race safely and without interference from vehicular traffic.  *Id.* ¶ 14.  Because the pace of the runners varies, the number of closed intersections typically increases as the field becomes more dispersed. O'Rourke ¶ 14.   The Department uses the rolling closure tactic to minimize the impact on participants and spectators travelling to South Boston for the afternoon parades.  *Id.*  After the Road Race ends, the AWV Parade route remains open until 12:30 p.m. to allow parade participants and spectators adequate time to travel to their designated staging areas and desired viewing locations, respectively.  *Id.* ¶ 15.

Under the operational plan, the Department closes the AWV Parade route to traffic at 12:30 p.m. and does not permit vehicles to cross the route until the conclusion of the VFP Parade several hours later.  *Id.* ¶ 16.  Pedestrians are allowed to cross the route, but only at designated intersections when there are no parade marchers.  *Id.*

The road closures, while necessary to secure the area and protect the participants and spectators from vehicular traffic, significantly limit the public's ability to traverse South Boston

from the north to south and vice versa. *Id.* ¶ 17. The AWV Parade route runs nearly the entire length of the neighborhood along West and East Broadway and effectively separates the northern and southern areas of the neighborhood. *Id.* In order to bypass the parade route, vehicles must detour around the eastern end of South Boston, nearly two miles from the start of the AWV Parade route. *Id.* As a result of the road closures, participants and spectators who are coming from the north and south and desire to reach the opposing side of the AWV Parade route must cross the route no later than 12:30 p.m. to avoid detours. *Id.* Additionally, due to the road closures, as of shortly after the AWV Parade begins, Andrew Square, the West Fourth Street Bridge, and the streets surrounding the Broadway MBTA Station are closed to traffic. O'Rourke ¶ 18. These closures effectively shut down the area of South Boston bounded to the northeast by West Broadway, to the west by Dorchester Avenue, and the southeast by Dorchester Street. *Id.* No vehicles may enter this area, and vehicles inside the area cannot exit. Emergency vehicles must pass through police barricades to respond to calls. *Id.* Despite the availability of public transportation at the eastern end, a large number of spectators and participants travel to South Boston via motor vehicle. O'Rourke ¶ 19. Because of this large influx of vehicles, one of the primary concerns of the Department is to ensure the uninterrupted flow of traffic into and through the neighborhood to avoid gridlock. *Id.*

In recognition of the limitation of access caused by the road closures, the Department does not close the AWV Parade route until 30 minutes before the parade start time. *Id.* ¶ 20. As part of its operational plan, prior to the beginning of the AWV Parade, the Department conducts separate sweeps of the route for explosives and to deter public consumption of alcoholic beverages. Id. ¶ 21. After the initial sweeps, the Department deploys assets to monitor the route for suspicious activity, explosive ordinances, and public consumption of alcohol. Id. ¶ 22.

Over the past couple of years, multiple public safety concerns have arisen concerning the AWV Parade.  O'Rourke ¶ 23.  First, there has been a substantial increase in complaints and incidents of public consumption of alcohol, assault and battery, and indecent exposure (public urination) in public streets among spectators to the AWV Parade, as well as licensed premise violations in bars and restaurants in South Boston.  Id. ¶ 24.  In recent years, the Department has dedicated significant resources to address public consumption of alcohol, batteries, indecent exposure (public urination) and licensed premise violations, in order to ensure a safe and secure family environment for the AWV Parade marchers and spectators.  Id. ¶ 25.

Several areas along the route in particular have posed serious problems in recent years. Id. ¶ 26.  There have been numerous instances of violence and underage consumption of alcohol among spectators in the Dorchester Heights area.  Id. ¶ 27.   The Department has been forced to deploy multiple units, including public order platoons and mobile field forces, to address these issues.  *Id.*  The most serious concerns related to the area surrounding Andrew Square, the requested finishing point of the route.  O'Rourke ¶ 28.  In addition to the vehicular traffic issues created by the closure of Andrew Square and the surrounding streets, there is massive pedestrian gridlock surrounding Andrew Square.  *Id.*  Thousands of spectators congregate on the sidewalks on Dorchester Street and in Andrew Square to watch the AWV Parade.  *Id.*  Additionally, thousands of spectators who witness the parade at other locations travel to Andrew Square to enter the MBTA Station to exit South Boston.  *Id.*  This creates significant pedestrian gridlock in the area.  *Id.*  Because of the road closures, pedestrians on the south side of Dorchester Street cannot access the MBTA Station from Andrew Square.  *Id.*  In order to access the MBTA Station, pedestrians south of Andrew Square must cross Dorchester Street at Old Colony Avenue (during a gap in the parade).  *Id.*  The northern sidewalk of Dorchester Street is narrow and

becomes clogged with spectators viewing the parade and others attempting to get to the MBTA

Station.   *Id.*   At any given time, the north sidewalk of Dorchester Street is three to four people

deep and can be virtually impassable, as spectators try to view the parade and others try to pass

through to get to the MBTA Station.   *Id.*   In addition, the crowd that gathers in Andrew Square

is typically boisterous.   O'Rourke ¶ 29.   Because Andrew Square is the finishing point of the

AWV Parade, spectators in that location have had the opportunity to consume alcohol for several

hours prior to the arrival and conclusion of the parade, and a large number of them are heavily

under the influence of alcohol by the time the parade approaches 2:30 p.m., and even more so by

the end of the Parade.   *Id.*   In recent years, the combination of pedestrian gridlock in Andrew

Square and the day-long consumption of alcohol by spectators has led to multiple violent

confrontations.   The Department has focused significant resources to address these issues in

Andrew Square.  Id. ¶ 30.   There have also been an increased number of incidents of parade

spectators climbing onto roofs along and near the parade route over the last several years.   In

2012, an individual was hospitalized after falling off a roof near the parade route.  Id. ¶ 31.   The

Department has addressed this issue by deploying rapid response teams and specialized units to

remove individuals from rooftops.   *Id.*

In addition to the concerns specific to the AWV Parade, security concerns in the City of

Boston and the United States have increased greatly over the last several years.   O'Rourke ¶ 32.

In particular, the threat posed by terrorist groups both within and outside of the United States is a

significant factor considered by the Department in developing its operational plan.   *Id.*   The

terrorist attack at the Boston Marathon on April 15, 2013, for example, illustrated the critical

importance of counter-terrorism and explosive ordinance detection at large public events.   *Id.* ¶

33.

In 2015, the City of Boston modified the parade route as a result of significant accumulation of snow on the streets of South Boston (the "Shortened Route").  O'Rourke ¶ 34. The Shortened Route began on West Broadway near the MBTA Station, then continued along West Broadway to East Broadway, before terminating at Farragut Road at the end of East Broadway.  *Id.* ¶ 35.  The number of spectators who attended the 2015 AWV Parade was approximately the same as the number of spectators in recent years past.  *Id.* ¶ 36.  Despite the high turnout, the Department's calls for service in District C-6 (South Boston) on the day of the AWV Parade decreased from 239 in 2014, to 63 in 2015.  *Id.* ¶ 37.  Additionally, the City's Emergency Medical Services calls for service in South Boston on that day decreased from approximately 143 in 2014 to 63 in 2015.  *Id.* ¶ 38.

The Department continually assesses its operational plans for large public events, including its plan for the AWV Parade.  O'Rourke ¶ 39.  To that end, the Department has considered the impact of the length of the AWV Parade on security and public safety and has concluded that the Shortened Route provides a safer and more secure atmosphere for parade marchers, spectators, and residents of South Boston for several reasons.  *Id.; Evans* ¶ 26.  First, the Shortened Route allows the Department to concentrate its anti-terrorism and explosive ordinance detection efforts in a reduced area, which increases their thoroughness and effectiveness.  *Id.* ¶ 40; Evans 20.  The Shortened Route also allows the Department to concentrate its resources in a smaller area.  *Id.*  The reduced area allows the Department to respond more swiftly to complaints and incidents involving individuals on roofs, public drinking, and public urination, as specialized units and designated response teams typically have less ground to cover to respond to calls.  *Id.*; Evans ¶ 21. The Shortened Route also greatly reduces vehicular and pedestrian congestion, and improves access for emergency vehicles.  *Id.* ¶¶ 41, 42.

The Shortened Route eliminates the congestion, excessive drinking, and violence that affected Andrew Square over the past several years. *Id.* ¶ 43.   Vehicular and pedestrian traffic flowed freely through Andrew Square in 2015 and allowed individuals to enter and exit South Boston more easily. *Id.*  Finally, the Shortened Route was also more cost effective for taxpayers of the City.  Evans ¶ 22.   In 2014, the Department assigned over 738 personnel to the parades for overtime cost of $298,073. *Id.*  In 2015, that number was reduced to 592 personnel for overtime cost $208,826. *Id.*

Additionally, the Shortened Route has filled in the gaps of spectators that were present when the parade proceeded along the old route, particularly areas along West Broadway from B to D Streets, and several sections of the route along East Fourth Street prior to Thomas Park. *Id.* ¶ 45.  The Shortened Route provides a much safer and more secure experience for spectators, parade participants, and residents of South Boston. *Id.* ¶ 46.

Following the 2015 AWV Parade, the City received positive feedback from numerous residents of South Boston who were in favor of the Shortened Route.  Evans ¶ 23.  In particular, residents were supportive of the reduced impact on the neighborhood, including the increased flow of traffic. *Id.*  The City has also evaluated other parades that take place in the City to see whether current operational plans preserve public safety.  Evans ¶ 13.  The City has since modified the routes for the Caribbean/J'ouvert Parades in Roxbury, the Allston/Brighton Day Parade, and the First Night Parade in Back Bay.  Evans ¶ 14.

ARGUMENT

I.    LEGAL STANDARD

To obtain preliminary injunctive relief, the plaintiff bears the burden of persuasion, and the court considers: "(1) the likelihood of success on the merits; (2) the potential for irreparable

harm to the movant in the absence of an injunction; (3) the balance of the movant's hardship if

relief is denied versus the nonmovant's hardship if relief is granted; and (4) the effect, if any, of

the decision on the public interest." *The Maine Educ. Assoc. Benefits Trust v. Cioppa*, 695 F.3d

145, 152 (1st Cir. 2012). In order to obtain "the more extraordinary relief of a temporary

restraining order," Allied must show that its injury or loss is "immediate and irreparable." See

*Duclerc v. Bender*, 2010 WL 5283292, at *2 (D. Mass. Dec. 16, 2010), citing Fed. R. Civ. P.

65(b). Allied has failed to overcome its substantial burden of proving that the City violated its

First Amendment Rights by shortening the route it requests ("Requested Route") by two miles,

that marching on the Shortened Route causes it irreparable harm, or that the balance of harms

weighs so heavily in its favor that this Court should grant immediate injunctive relief.


II.     ALLIED IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS FIRST
        AMENDMENT CLAIM WHERE THE CITY SHORTENED ALL PARADE ROUTES
        ON MARCH 20, 2016, WHERE THE SHORTENED ROUTE FURTHERS THE
        CITY'S INTEREST IN PRESERVING PUBLIC SAFETY, AND WHERE THE
        SHORTENED ROUTE PROVIDES ADEQUATE MEANS FOR ALLIED TO
        EXPRESS ITS MESSAGE.

The Shortened Route is a constitutionally permissible restriction on Allied's First

Amendment rights because it applies equally to all parades marching on March 20, 2016,

furthers the City's need to preserve public safety and order in the vicinity of the parade, and

affords Allied an adequate channel through which to communicate its message to its intended

audience. Time, place and manner restrictions on speech are permissible if they "are justified

without reference to the content of the regulated speech, [if they] are narrowly tailored to serve a

significant governmental interest, and [if] they leave open ample alternative channels for

communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989),

quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). In evaluating

such a restriction, the appropriate inquiry for a court is not whether the "government's interest could be adequately served by some less-speech-restrictive alternative," but whether its chosen means are not substantially broader than necessary to achieve its goal. *Ward*, 491 U.S. at 800. "The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Id.*, quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985).

> A.   The Shortened Route is a Content-Neutral Restriction Where it Applies to Both Parades and Has No Relation to Either Group's Message.

The City's decision to shorten Allied's Requested Route is a content-neutral restriction where it applies to the parades of both groups that have sought a permit to march in the South Boston neighborhood on March 20, 2016 without regard to either group's message. See *Ward*, 491 U.S. at 791 (stating government regulation of expressive activity is content-neutral if justification does not rely on speech's content). Both Allied and VFP requested the same parade route for March 20, 2016. In issuing both groups' parade permits, the City notified them of the same restriction: that the city had altered all parades taking place in the South Boston neighborhood on Sunday, March 20, to mitigate public safety and congestion concerns. See Affidavit of Timothy J. Bradeen and accompanying permits, at Exhibit C. The restriction is content-neutral.

> B.   The Restriction is Narrowly Tailored Where The City's Interest in Promoting Public Safety Would be Achieved Less Effectively if it Issued a Parade Permit for the Requested Route, and Where it is Not Substantially Broader than Necessary to Achieve the City's Public Safety Interests as it Does Not Substantially Burden Allied's Speech.

The Shortened Route allows the City to more effectively maintain control over the parade route while at the same time permitting Allied to march along part of its requested route and to

communicate its message   A regulation is narrowly tailored if it promotes "a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799.   The restriction need not be the least restrictive means possible to achieve the government's interest; it must simply not be "substantially broader than necessary to achieve the government's interest." *Id.* at 799-800.   "When a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000).

First, the City's interest in ensuring public safety and order in the vicinity of the parade route is a substantial government interest.  See *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) ("The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.").   It is also an interest that would be achieved less effectively if the City was required to accommodate Allied's Requested Route.  Specifically, the Shortened Route is safer because it allows the City to deploy its public safety resources in a more concentrated area, which increases the effectiveness of the City's anti-terrorism and explosive ordinance detection efforts, and it enables the City to respond more rapidly to incidents surrounding the route. Additionally, the Shortened Route relieves pedestrian and vehicular gridlock associated with the closure of Andrew Square and surrounding streets, ensuring more efficient ingress and egress for emergency vehicles, and avoiding the physical confrontations that accompany the consumption of alcohol and pedestrian gridlock surrounding the square.

Second, the City's interest in public safety is not obviated simply because it has been able to provide adequate public safety resources to cover the Requested Route in past years.   As shown in the Affidavit of Superintendent Bernard O'Rourke, in recent years, multiple issues associated with the Requested Route, including increased complaints and incidents of public consumption of alcohol, indecent exposure (public urination), and alcohol-fueled physical violence, as well as the current security climate and the experience gained from use of the Shortened Route in 2015, caused the City to reassess its operational plan and modify the Requested Route.   In determining whether to issue relief on a First Amendment claim, "the court 'cannot simply order whatever a City is physically capable of doing, without regard to considerations of public health, safety, convenience, and cost.'"   *Coalition to Protest the Democratic Nat. Convention v. City of Boston*, 327 F. Supp. 2d 61, 69 (D. Mass. 2004), quoting *Million Youth March v. Safir*, 155 F.3d 124, 126 (2d Cir. 1998).

Finally, the restriction is not substantially broader than necessary to achieve the City's interests in ensuring that public safety and order are preserved.   The City's decision to shorten all parade routes in South Boston on March 20, 2016 was grounded in public safety concerns specifically related to terrorism, as well as particular issues that have arisen in the past related to (1) vehicular and pedestrian gridlock on City streets, (2) the overconsumption of alcohol by spectators over the course of the Requested Route; and (3) the physical confrontations that have resulted from the combination of pedestrian gridlock and alcohol consumption.   The Shortened Route allows anti-terrorism units to effectively sweep the parade route, fosters swift and efficient responses to incidents as they arise along the route, and ensures a safe environment for participants and spectators alike.

In addition, the Shortened Route is not so restrictive that it substantially burdens Allied's freedom of expression. Cf. *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) (finding city's creation of demonstration zone for 2004 Democratic National Convention imposed substantial burden on plaintiff's speech, where it "dramatically limited the possibilities for communicative intercourse between the demonstrators and the delegates"). Rather, the Shortened Route still allows Allied to present its message in the central-most part of the neighborhood and on its main thoroughfare, an area to which parade-goers will have unfettered access. While the Shortened Route may lessen the distance that Allied may cover while spreading its message, the restriction is not substantially broader than necessary for the City to satisfy its interests in ensuring public safety and order and increasing its ability to quickly respond to incidents by concentrating its efforts and resources in a more contained area. The Shortened Route satisfies the tailoring requirement.

C.       The Shortened Route Provides an Adequate Alternative to the Requested Route Because it Provides an Equally Effective Channel Through Which Allied Can Reach its Intended Audience.

Allied claims that its parade route must pass by Dorchester Heights because of the historical significance of that location in relation to the events surrounding Evacuation Day. Marching past that site, however, does not substantially increase or change the symbolic nature of the message Allied seeks to convey, as it will be able to reach its intended audience as effectively by use of the Shortened Route. Cf. *Coalition to Protest Democratic Nat. Convention*, 327 F. Supp. 2d at 72 (finding that City's approved route did not leave open adequate alternative channels of communication where there was "symbolic importance" in marching next to the site of the Democratic National Convention in order "to bring to the attention of those who would listen to protesters' concerns about the direction of the Democratic Party"). Unlike at a convention, where attendees are concentrated in one location, parade-goers line the entire parade

route to watch the procession.  By marching past the parade-goers who will line the Shortened

Route, Allied is able to express its message as effectively at it would by marching past

Dorchester Heights where a small group of parade goers might be present.  See *Bl(a)ck Tea*

*Society*, 378 F.3d at 14 (finding demonstration zone for protesters an adequate alternative to

requested location in part because it provided an opportunity for expression "within sight and

sound" of intended audience, "albeit an imperfect one").  The Shortened Route presents a viable

alternative route by which Allied may express its intended message.

III.   ALLIED  WILL NOT SUFFER IRREPARABLE HARM IF THE COURT GRANTS
       ITS REQUEST FOR INJUNCTIVE RELIEF AND THE BALANCE OF HARMS
       WEIGHS IN THE CITY'S FAVOR WHERE THE CITY'S INTEREST IN PUBLIC
       SAFETY OUTWEIGHS ALLIED'S INTEREST IN MARCHING FOR AN
       ADDITIONAL TWO MILES AND WHERE THE SHORTENED ROUTE ALLOWS
       AN AMPLE ALTERNATIVE CHANNEL THROUGH WHICH IT MAY EXERCISE
       ITS SPEECH.

       The balance of harms in this matter weighs in favor of allowing the City to police the St.

Patrick's Day festivities in a way that most effectively preserves public safety--by concentrating

its resources along the Shortened Route.  The Shortened Route does not substantially burden

Allied's freedom of expression and still provides it with an adequate means of reaching its

intended audience.   If the TRO is granted, however, the City will be forced to deploy

substantially more resources in a less effective manner in order to safeguard the route.  See

*Coalition to Protest Democratic Nat. Convention*, 327 F. Supp. 2d at 72-73 (considering strain

on police resources in holding that balance of harms favored city in denying plaintiff's request to

enjoin city from reworking parade route while Democratic National Convention was in session);

*Irish Lesbian and Gay Organization v. Giuliani*, 918 F. Supp. 732, 748 (S.D.N.Y. 1996) (holding

balance of harms weighed in favor of city where "the City's legitimate interest in preserving

public order outweighs any hardship [plaintiff] suffers by not being able to hold its protest

parade at its preferred time and place"). Thus, this is not a case where the "exigencies of the situation demand [injunctive] relief." See *Braintree Laboratories, Inc. v. Citigroup Global Markets, Inc.*, 622 F.3d 36, 41 (1st Cir. 2010). Instead, an injunction in this case would threaten the City's ability to best manage an event that, in recent years, has created increased public safety risks including increased alcohol consumption and dangerous behavior.

IV.   **THE PUBLIC INTEREST WOULD NOT BE SERVED BY GRANTING ALLIED'S REQUEST FOR A TEMPORARY RESTRAINING ORDER WHERE THE REQUEST THREATENS PUBLIC SAFETY.**

The public interest would be compromised by the issuance of a temporary restraining order ordering the City to grant a permit to Allied for the entirety of its Requested Route. As set forth above, the Requested Route dilutes the effectiveness of the City's public safety resources, increases gridlock, and travels through areas that have created significant public safety issues in the recent past, to the detriment of spectators, parade participants and residents of South Boston who are not attending the parade. See *Black Tea Society*, 378 F.3d at 15 (holding that public safety is a valuable consideration when weighing effect of proposed injunctive relief on public interest). Additionally, the public interest is served by having increased freedom of movement within and entering/exiting South Boston, a more secure environment, and more effective enforcement against public alcohol consumption, public urination, and alcohol fueled physical confrontations. The public interest is served by having a safe, well-coordinated series of events in South Boston. The relief Allied seeks would lessen public safety and would reduce the City's ability to effectively coordinate the participants and spectators participating in the different events on March 20, 2016.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should deny Allied's motion for a

temporary restraining order and injunctive relief.

Respectfully Submitted,


DEFENDANT CITY OF BOSTON

Eugene L. O'Flaherty
Corporation Counsel
By its attorneys:

/s/ Peter M. Geraghty

_____

Peter M. Geraghty (BBO# 664197)
Special Assistant Corporation Counsel
City of Boston Police Department
One Schroeder Plaza
Boston, MA 02120
(617) 343-4550
Peter.Geraghty@pd.boston.gov


/s/ Catherine A. Lizotte

_____

Catherine A. Lizotte (BBO# 666468)
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Plaza
Room 615
Boston, MA 02201
(617) 635-3215
Catherine.Lizotte@boston.gov

Dated: March 15, 2016


**CERTIFICATE OF SERVICE**

I hereby certify that on this day, March 15, 2016, a copy of this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, paper copies will be sent to those indicated as non-registered participants, and the registered participants will be served by hand delivery.

| 3/15/2016 | /s/ Peter M. Geraghty |
|---|---|
| Date | Peter M. Geraghty |