```
 1                       E X C E R P T

 2                       * * * * * * * *

 3            THE COURT:  Let me explain my reasoning, and the

 4   reasoning has very little to do with the testimony I just

 5   heard.  If this were purely a public safety issue -- and I

 6   understand that there is a strong component of public safety

 7   at stake -- I am thoroughly persuaded by Superintendent

 8   O'Rourke and Commissioner Evans that they know what they're

 9   talking about.  They have 38 years of experience, which

10   obviously I do not have, nor any of the rest of us, I

11   suspect, sitting in the room.  But I do not think that

12   public safety is the issue at stake at the moment.

13            What I do not want us to lose sight of is the fact that

14   this case involves a matter of constitutional protection.

15   Parades, and in particular this parade, are protected by the

16   First Amendment, as Justice Souter told us for a unanimous

17   Court, and this is case, Mr. Darling, that you know well, in

18   Hurley v. Irish American Gay, Lesbian, and Bisexual Group of

19   Boston, 515 U.S. 557, 568 (1995).

20            Justice Souter pointed out that a parade is not merely

21   motion but, rather, a public drama of social relations whose

22   inherent expressiveness depends on marching in the public

23   eye.

24            It is clear from Supreme Court cases that the State has

25   a freer hand in restricting expressive conduct than it does
```

1   in regulating the content of written and spoken words, Texas
2   v. Johnson, 491 U.S. 397, 406 (1989).  But how free a hand
3   the state has depends to a great degree on the extent to
4   which public property under government control has been
5   traditionally devoted to expressive activity, Perry Educ.
6   Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37, 45
7   (1983) Where public property is designated for use as a
8   public forum, attempts by the State to regulate expressive
9   conduct in that forum are subject to the strictest scrutiny
10  under the First Amendment. Id.
11       It is also clear from Supreme Court decisions that
12  municipal streets and sidewalks are traditional public fora,
13  Id., citing Hague v. CIO, 307 U.S. 496, 515 (1939).  It is
14  true that the State is permitted to impose restrictions on
15  expressive conduct that are designed to promote the public
16  convenience, so long as these restrictions are not
17  susceptible to abuses of discriminatory application, Cox v.
18  Louisiana, 379 U.S. 536, 554 (1965).
19       I think the case most on point for us at the moment is
20  Cox v. New Hampshire, 312 U.S. 569, 576 (1941).  I will read
21  one extract, and I apologize for its length, but I think it
22  is very important what the Court is saying.
23       "It is, of course undisputed that appropriate, limited
24  discretion, under properly drawn statutes or ordinances,
25  concerning the time, place, duration or manner of the use of

1    the streets for public assemblies may be vested in
2    administrative officials, provided that such limited
3    discretion is exercised with uniformity of method of
4    treatment upon the facts of each application, free from
5    improper or inappropriate considerations and from unfair
6    discrimination, [and with] a systematic, consistent, and
7    just order of treatment, with reference to the convenience
8    of the public use of the highways."
9         I do not know the history of the parade as well as some
10   of you do, but we do know from Hurley that Evacuation Day
11   has been designated as a public holiday in Massachusetts
12   since 1938.  Justice Souter identifies the tradition of a
13   celebratory parade as having begun as early as 1901.  I do
14   know from his opinion that in 1947 Mayor Curley appointed
15   the Council as the chief organizer of the parade and, as I
16   understand it, the Council has sponsored, applied for, and
17   been issued a permit for the parade by the City since that
18   time with the one exception that has been alluded to.
19        The route of the parade, which I understand to be
20   roughly 3.2 miles, has remained essentially unchanged for 20
21   years.  The one significant deviation was last year when all
22   of us remember the largest snow accumulation that any of us
23   have experienced and, according to meteorologists, perhaps
24   the largest in the recorded weather history of the city of
25   Boston.

1         What troubles me here, and this will lead me to the
2    balancing of the factors I need consider with respect to a
3    temporary restraining order is the sequence of events that
4    took place leading to the hearing today.  As I understand
5    from the documentary record, the Council applied for the
6    permit for the parade in April of 2015, that is, some seven
7    or eight months ago.  The City did not act formally on the
8    application until February 26 of this year when the Council
9    was informed that the parade route had been drastically
10   modified.  The two reasons given for curtailing the parade
11   were:  To mitigate public safety and crowd congestion.
12        There had been some preceding give and take with the
13   Council, but, again as I understand it, there was a request
14   from the Transportation Department, which did not issue
15   until February of this year, for a letter in which the
16   Council was to explain the organization of the parade.  That
17   letter was duly submitted.
18        The parade organizers, I believe, were then told there
19   would be potentially a shortening of the route of the
20   parade.  The organizers responded on February 24, 2016, with
21   a letter explaining the reasons why they disagreed with any
22   such course of action, were it to be taken.  And, as I said
23   earlier, on February 26 the permit issued curtailing the
24   route of the parade without any further consultation with
25   the Council.

```
 1            MR. GERAGHTY:  Your Honor, I'm hesitant to
 2   interrupt while you're speaking, but I did want to make a
 3   point about that time line, because I don't believe --
 4            THE COURT:  Go ahead.  Make the point then.
 5            MR. GERAGHTY:  Thank you, your Honor.
 6        Your Honor, if you look at the application from April
 7   of last year, that's not a valid application for a parade in
 8   the city of Boston.  It was directed to a completely
 9   different department, the department of Parks & Recreation.
10   And the facts from the papers show that not only did the
11   Police Commissioner have discussions with a member of the
12   Allied War Veterans throughout last year about the potential
13   change to the route and his concern, but as soon as the
14   Boston Transportation Department, the department that
15   actually issues parade permits in the city, became aware of
16   this on, I believe, February 25, a permit issued with the
17   modified route the very next day.  So I don't believe that
18   it's accurate to say that the City sat on an application for
19   10 months.
20            THE COURT:  I do not think my point was that the
21   City sat on the application.  Rather, I do not think the
22   City, whether the paperwork went to the right mailbox or
23   not, given a history that dates back to 1947, was caught by
24   surprise by the fact that the organizers intended to go
25   ahead with the parade, and given that the route had been
```

1  unchanged but once in 20 years, I do not think there would
2  have been a great deal of surprise that the Council intended
3  to follow the same route.  But I accept your correction, but
4  it does not change my mind that what I am critical of here
5  is the process that the City followed.
6  Not that the City is necessarily wrong.  As I said,
7  from what I heard today from the Commissioner and the
8  Superintendent, it appears to me that the City has a
9  persuasive case, although the real case being made perhaps
10 says more about banning the sale and consumption of alcohol
11 than it really does with the length and duration of the
12 parade itself, but that is neither here nor there.
13 When I balance the factors for a TRO - and here we are
14 not talking about a preliminary injunction because I think
15 the City might well prevail in terms of the how the parade
16 is conducted in the future - but we are sitting here now,
17 five days before the event, planning has been done, and we
18 have a group that is attempting to exercise a protected
19 First Amendment right.  In terms of the likelihood of
20 success, at least in terms of the equities for this year, my
21 judgment is that the Council is more likely to succeed on
22 the merits than the City.
23 In terms of the balance of harms, I have great
24 confidence in the Boston Police Department.  When the
25 Superintendent and Commissioner tell me that they can assure

1   public safety, although not to the degree I know that they
2   would like, or feel that they could provide, if they had a
3   smaller crowd area to manage, I am confident that that
4   public safety will be protected.
5       In terms of the public interest at stake, I think the
6   public is more heavily invested in the protection of
7   constitutional rights than it might be in whatever savings,
8   which here what I have heard, and this is anecdotal, is a
9   potential saving in overtime of some $80 or $90,000.  Not
10  that that's inconsequential, but it is very hard to develop
11  a market for first Amendment rights, and it seems to me on
12  balance that it is a price worth paying to see that a
13  fundamental constitutional right is honored.
14      I think the public safety argument, as I said before,
15  is a good one.  On the other hand, the mitigation of the
16  risk of congestion, frankly, is reasoning that I do not
17  follow at all.  It seems to me taking, whether it's a
18  million people or a half-million, and pushing them into a
19  space that's 40 percent of the size of the space that they
20  would otherwise occupy, I do not understand how that
21  mitigates congestion.
22      I think the Commissioner said exactly the right thing
23  with respect to the due process that has been afforded other
24  groups.  The City has worked with these groups, and these
25  groups have been willing to accommodate the public safety

```
 1    concerns that the City has.  I have confidence that the
 2    Council would be willing to engage in that kind of
 3    consultive process, or, if not, we can go forward with the
 4    preliminary injunction and give everyone a chance to offer
 5    all the evidence that they wish to on the issue.
 6         With respect to the temporary restraining order, I am
 7    going to direct the City to issue the permit as applied for
 8    with respect to the traditional route.
 9         I am denying without prejudice the request for a
10    preliminary injunction directed to future parades.  That is
11    a matter that the Court will take up in a more considered
12    way with a reasonable amount of time to allow everyone to be
13    fully heard on the issue before a final decision a made.
14         So that will be the judgment of the Court.
15         Let me explain to the parties that I will use the court
16    reporter's transcript as the rationale for the decision,
17    simply to expedite matters, and I will take the opportunity
18    to add the case citations to the reporter's transcript where
19    they are appropriate and to correct my misnomers.
20         But thank you for a spirited hearing, and I
21    particularly want to thank the Superintendent and
22    Commissioner for being here.  I know you have many important
23    things to do, which is one reason that I do not want to keep
24    you any longer than is necessary.
25         We will be adjourned on this matter until the next
```

```
 1    hearing on the preliminary injunction should one be
 2    necessary.
 3              THE CLERK:  All rise.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```